Lauren King for the Quileute Tribe. I'm here today with Eric Nielsen for the Quinault Nation and Craig Dorsey for Hoh. We'd like to reserve eight minutes for rebuttal, with which Mr. Nielsen will be arguing, but if the court has any questions for Mr. Dorsey on Hoh's appeal, we can also reserve one to two minutes out of our rebuttal time. I'll try and help you keep track of your time, but you've got to also watch that clock. That clock is counting down. All right, I will. Thank you, Your Honor. The question before the court today is whether Quileute and Quinault have waived their sovereign immunity to an adjudication of the western boundary of their federal water fishing grounds, and the answer is no. That's guided by three legal principles. A waiver of sovereign immunity must be explicit. There is a presumption against waiver of sovereign immunity, and what waiver comes out of participation in litigation has to be construed narrowly and extends only to those issues necessary to resolve the claim for relief brought by the tribe. It doesn't extend to related issues if those related issues are not necessary to resolve the relief. Well, except for, you know, why shouldn't we rule here that if you're in for a penny, then you're in for a pound, in seeking judicial determination of the scope of your treaty rights? The Supreme Court, in the Fidelity Guarantee case, said literally if you're in for a penny, you're in for a penny, and you're immune to a counterclaim for a pound. And that was the case where a tribe had a royalty claim, and then there was a counterclaim for an amount over that, and the court said you're immune from that counterclaim. Well, your argument would be better if you hadn't initiated a sub proceeding in 83-9 against the Macaw in the Treaty Troll case, and a waiver of sovereign immunity. Your argument would be better if you hadn't done that. In the Treaty Troll case, Macaw had already consented fully to adjudication of its UNA by requesting the court to do it in 1977 and again in 1981, thereby putting that whole area at issue. And with respect to what Quillian and Quinault were requesting for relief in that case, and again that's the test for sovereign immunity, what did the tribes ask for for relief? No adjudication of their ocean fishing boundaries was necessary. They were requesting that the court do an equitable allocation because Macaw was intercepting salmon before it came into Quillian and Quinault's in-river fisheries. So the only request for relief was for their in-river fisheries. So when you intervened in the main case, what did you understand that you were waiving your sovereign immunity? To adjudication of treaty rights vis-à-vis the state of Washington. So the question on intervention is a really important one. I'm glad you brought it up because the tribes claim in that initial case was against the state of Washington to prevent the state of Washington from interfering with their treaty rights. And a necessary part of that claim for relief was to say, and this is exactly where your regulations don't apply. But it turned out that as the litigation unfolded, it extended beyond the borders of the state of Washington. Because certain, and I think you're getting at the allocation cases here, which is one of Macaw's three theories for waiver. Those cases involved fisheries that were partly in the ocean, but that doesn't amount to a waiver of all things ocean. So if you look at the Pottawatomie case, for example, a tribe brought a claim challenging a state's imposition of a tax, and the court held that didn't waive their immunity to all things tax. It didn't waive. But every single one of these cases requires interpretation of the treaty, right? Yes. Whether it's just Washington, whether it goes out further, or whatever. It all has to do with the touchstone is what does the treaty say? Right. But if the waiver were to all things treaty, then we'd be in here talking about hunting. We would be in here talking about, you know, thou shall not make war on other tribes provision. Well, but your approach seems to me that we waive sovereign immunity piece by piece until we don't like what a court does, and now we've decided we're going to do something else. Respectfully, no. Our approach is you waive sovereign immunity piece by piece, and we believe that is the precedent from the Supreme Court and this court, is that you do look at exactly what the tribe has requested as far as releases. Oh, but you intervened into the case. We did. We did. At a time when. You intervened into the case. At a time when. This case is all about treaty rights. Right, right. And I think a hypothetical that might help is if we assume that there was jurisdiction outside of three miles at the time. There was 1331 jurisdiction here. Sure, but the United States hadn't extended its jurisdiction beyond three miles in the ocean in 1974. That didn't happen until the Magnuson-Stevens Act in 1976. So upon intervening in 71, there's no way that anybody could have foreseen that we would have gone out to 200 miles in 1976. But it was all about interpretation of the treaty, what rights the tribes had under the treaty. The claim for relief was for an injunction against the state of Washington. Right. And these treaties are self-executing. So when you think about are they contingent on going into court and proving where you fished in 1855, the answer is no. The tribes agreed to that contingency when they went into the court  And it had to, of course, as a part of that, answer where the state of Washington's regulations did not apply. We don't have that issue in federal waters. And going back to that hypothetical, if the federal government had jurisdiction in 1974, the caption of the case is not going to look like United States v. United States. I'm not sure what you do with United States v. Oregon. Are you saying it's been abrogated or only that it's been confined to its facts? And even accepting that Oregon has been confined, how are the facts here distinguishable? Our position is that the case has been confined to its facts. And this case is distinguishable because in Oregon, Yakima came into that case asking for an injunction on Chinook salmon in the Columbia River. And then later on, Washington came in asking for an injunction against Yakima in the same case area, in the same species, in the same subject matter. And the court said, well, you came into court asking for this relief, and that could have been resolution to your relief at the time you brought that case. And that's not the case here where you look at the standard for immunity. Was adjudication of the western boundary necessary to resolve the tribe's claim against the state of Washington on intervention? And the answer is that wasn't even possible. Can I take you back to the 83-9 proceeding? That was the 83 indicates that it was in 1983. Is that right? Yes. And the, I'll call them the QQH tribes, initiated a suit against the Macaw. Is that correct? Yes. The only question in that case regarding sovereign immunity would be a waiver by the Macaw. Right. Is that right? Correct. And the district court's ruling was that they had waived their sovereign immunity. They did not appeal that. So we have no Ninth Circuit ruling in that case. Is that correct? Correct. Okay. So what was the basis for the district court's ruling that the Macaw had waived their sovereign immunity? They relied on Oregon's kind of you're in for equity, you're in for all equity. And I think, again, that rationale. U.S. versus Oregon. Yes, U.S. versus Oregon. My apologies. So I think that that rationale has been clarified by subsequent. But that is a waiver as to, that was a judgment that the Macaw had waived their sovereign immunity when they entered into Judge Bolt's proceedings. Right. So that all had to do with the scope of the Bolt proceeding rather than something else. Right. Had the Macaw brought a counterclaim against the, I'll call them the QQHs just for my convenience, against the QQH tribes, would that have been sustainable in that action? Well, because in that case, the QQH tribes were trying to defend their in-river fisheries, I think that would have been a question of what you were just dealing with in 054, which is reassessing what Judge Bolt meant with the in. So it would have, the counterclaim would have been sustainable to the extent that QQH tribes had waived their sovereign immunity in the Bolt proceeding. Correct. Okay. So if the, then the 839 can't be an independent basis here if the only waiver of sovereign immunity that was at issue there was whether they originally waived their sovereign immunity with respect to the Bolt rulings. Correct. You have to look at exactly what claim for relief was asserted and what was necessary to resolve. There's no marginal waiver of sovereign immunity in 839. Correct. All right. So you have to go back and look at what is at stake when you intervene. Right. And again, going back to the hypothetical, if the federal government had jurisdiction beyond three miles at the time, we wouldn't have the claim to tell the federal government exactly where their regulations apply, exactly where they have to acknowledge treaty boundaries, because they did it. They did it 30 years ago. And the federal fisheries are governed under this completely separate regulator, under a completely separate regulatory scheme, the Magnuson-Stevens Act, where they took care of the boundaries in 1986, and they don't require the tribes to come and adjudicate those areas before they can go fish and before they can go enforce their self-execution. When you intervened early on, you know, in the main proceeding, what was it you were seeking to accomplish? An injunction against the state of Washington to prevent interference with our treaty fishing rights. And that depended on an interpretation of your treaty rights, correct? Yes, within the state of Washington. And, again, the claim for relief was against the state of Washington, and a necessary question that Washington raised, rightfully so, was where, okay? You've got treaty rights, so where do we acknowledge those? We've never had that problem with the federal regulator. Well, those treaty rights could have extended out into the Pacific Ocean, right? Yes, yes. And the federal government has acknowledged that they do ever since the Magnuson-Stevens Act was enacted. And that's another reason why this case is not United States v. United States. We just never had a reason to ask for relief against the federal government regarding our boundaries. How are you going to allocate your time? We're observing eight minutes for rebuttal. So I think, you know, going back to your point about in for a penny, in for a pound, we have a very clear message from the Supreme Court that if you're in for a penny, you're in for a penny. And you have to look at, for each one of these sub-proceedings, what relief the tribe requested. That is the touchstone. Macaw can't show you one proceeding where Quileute or Quinault asked for relief that made adjudication of their western boundary necessary. What this really comes down to is Macaw wanting a second chance to do what it chose not to do when it was a party in midwater trawlers, which is to challenge those boundaries that were subject to that case. Macaw does this at the expense of Quileute and Quinault's livelihood and ocean fishing cultures. The bottom line here is the standard for waiver of sovereign immunity has not been met, and we ask that this Court reverse the district court and remand for dismissal. Thank you. Okay. Good morning, Your Honors. I'm Mark Sloan, and I represent the Macaw Tribe. I'd like to leave a few minutes for my colleagues. Mr. Pinesco asked for two minutes and Ms. Rasmussen asked for two, so I'll use the rest of the time. As described in Macaw's request for determination, Macaw initiated this sub-proceeding after Quileute and Quinault threatened to preempt Macaw's established fishery for Pacific Whiting, fishery that's previously been before this Court, as Judge Callahan may recall. The determination Macaw seeks of Quileute and Quinault's usual and accustomed fishing grounds is no different than the determination of usual and accustomed grounds that's been made for every other tribe in the United States via Washington. This is, to our knowledge, the first time a sovereign immunity defense has been asserted in a usual and accustomed grounds proceeding. I'd like to address three issues. First, I'd like to touch briefly on the issue of appellate jurisdiction. Then I'd like to touch on the merits, and if I have time, on the impact of the federal regulations that Ms. King referred to. With respect to appellate jurisdiction, we think the issue turns on whether the district court's September 28, 2011 order conclusively rejected the sovereign immunity defense. Was that the first order? That was the first order, Your Honor. As the Seventh Circuit said in Fairley, quote, once a conclusive resolution has been reached at either the motion to dismiss or summary judgment stage, a renewed motion for the same relief or a belated request for reconsideration does not reopen the time for appeal. In the court's September 28, 2011 order. Let me just stop you there. I just want to make sure I get clarification here. That doesn't then forfeit the right to assert sovereign immunity. It simply means that you would have to press it after a trial on the merits. Is that correct? Absolutely. It can always be raised. It just can't be raised anymore until you've forfeited your right to bring the challenge at that time. Right. You can bring an interlocutory appeal if you file it after a conclusive determination during the course of the litigation, or you can wait until the end of the case. You've got two pressure points where you can bring it, either after a motion to dismiss or after a motion for summary judgment. Is that your? Not in this case. If the motion to dismiss is not conclusive, but it turns if the court says there are sufficient factual allegations in the complaint to get by a motion to dismiss, and then you bring a motion for summary judgment, you can appeal at that point. But that's not what the court did in this case. The court didn't look to the allegations of the complaint. It looked to the record in this proceeding and said, based on that record and the law of the case, there's a waiver of immunity. There was nothing left to decide at that point on the sovereign immunity issue. And that's why we think that will not. So why did the court have to clarify it later if it was so clear? I don't think the court did clarify it. What the court said in its later orders was that it had already decided the issue. It viewed the request for clarification as a belated motion for reconsideration and said that was untimely. I thought that all had to deal with which provision the court was going to proceed under, under paragraph 25 in the injunction order. That's correct, Your Honor. Is it going to be A-1 or A-6? Six. Right. But doesn't that make a difference? If it's A-1, it tells you that it's the record that exists in the case. If it's A-6, it suggests the possibility that the record is open. It may be new material that the court will take into account. I agree with that, Your Honor. But then doesn't it make a difference for a party who's considering when strategically they ought to appeal their sovereign immunity as to whether the record is closed or whether the record is open? Well, sovereign immunity is not a defense to how an issue is going to get decided. It's an issue to whether some issue can be asserted or not. So in this case, McCaw sought a determination of the ocean fishing grounds of Quileute and Quinault. The A-1, A-6 debate is how do we answer that question? Do we answer it just by looking at Judge Bolt's findings or do we answer it by taking new evidence? But the issue whether they have waived their immunity for purposes of a determination of their ocean fishing grounds is the same. Keep in mind that they have never asserted immunity with respect to a determination in state waters. The question, and as you can see from the last case and looking at this case, these are pretty complicated questions. They're complicated questions of fact. There's not a whole lot of law that has to be done here, but there's a lot of questions about what the orders did, what Judge Bolt had in mind, whether what Dr. Lane thinks today is of any consequence to what Dr. Lane thought in 1974. These are complicated questions. And if somebody thought that the record might still be open, wouldn't that have an impact on whether you thought that you had a claim for sovereign immunity or not? Well, I can see strategically why you might think that. But the sovereign immunity defense is a defense that they haven't waived their immunity for purposes of a determination of their ocean fishing grounds. It's not a defense to how it's determined. It's a defense to what is being determined. And it was clear from the beginning of this case that it involved the ocean fishing grounds. There's an order, Judge Martinez entered an order before his September 28 order that I'm relying on, in April denying the state's motion for leave to file a cross-claim. And in that order, he said that the area put in dispute by McCall lies outside the territorial waters of the state of Washington. So we all knew what we were talking about. In the September 28, and that's at ER 47. In the September 28 order, which is at ER 39, he said McCall is seeking determination of Quileute and Quinault's usual and accustomed grounds in the Pacific Ocean. So we all knew what we were talking about. And he said that as to sovereign immunity, there's a waiver, and that's the end of the matter. There's a waiver of immunity. And what Quileute and Quinault have done is said, well, we kind of liked the way he was going to answer the question, so we didn't appeal. And now that he said we're going to actually have, we might have some new fact-finding, we don't like the way he answered the sovereign immunity question. But he answered that question in the September 28 order. And we think that was conclusive and that the appeal is, therefore, untimely. Let me, but let me. So if you go to the, let's just, let's go to the qualified immunity just because I'm sure you want to talk about, not the qualified, I mean the sovereign immunity. What parts of the record in the original Washington proceeding best demonstrate that the case's geographic scope extended beyond state waters? Well, the first thing I would point to, Your Honor, is Quileute's complaint and intervention, where they requested, first of all, the case was not just about an injunction. It was a request for a declaratory judgment defining the nature and extent of the treaty right. Secondly, in the Quileute complaint and intervention. You're talking about in the main case? In 1971, in the main case. Washington. When they first intervened in U.S. v. Washington, they said that they wanted a ruling that they had a fishing right at all of their usual and accustomed grounds and that those grounds included waters, quote, within and contiguous to the State of Washington, including but not limited to the ocean waters of the Pacific. So they sought the very determination that we're seeking now. Quileute was somewhat less clear. Let's just, I want to parse that language. Would you read the language about the contiguous, the ocean waters? Yes. The part I have here is within and contiguous to the State of Washington, including but not limited to, and then there were several categories, and one of them was the ocean waters of the Pacific. That was the language, and that's in MSER. You interpret the word within to mean not on the land or inside the hard boundaries, but inside the three-mile, the State of Washington including three miles into the ocean, and therefore contiguous to meant that it had to be outside of three miles. That's correct, Your Honor. And I think the ocean waters of the Pacific make that pretty clear. Quileute was somewhat less specific, but they also requested an adjudication of their usual and accustomed grounds or a declaration of those grounds without geographic limitation. And as I understand their position now is, well, they couldn't expand the case, and the U.S. wasn't seeking relief outside the state. But they did expand the case because the U.S. didn't seek any relief on behalf of Quinault. When Quinault moved to intervene, it added a new tribe and a whole new set of usual and accustomed grounds, and everybody accepted that. Let me also point, though, to the 1983 Treaty Troll Ruling that Your Honor asked about before, because I think it's important in two respects. First of all, that ruling established the law of this case as to the waivers of immunity. I'm sorry. Is this the 83-9 proceeding? Correct. Okay. And in that ruling, the Court said that by intervening in the case and seeking an adjudication of a tribe's treaty right, the tribe consented to a full adjudication of its treaty fishing right. Not in for a penny, in for a patent, not just for a penny, but to a full adjudication of the treaty fishing right. And keep in mind, as Ms. King pointed out, that that wasn't a UNA case. That was a case seeking an allocation of the coastal coho harvest. Macaw hadn't sought any relief with respect to allocation of coastal coho between Macaw and Quinault. It had never sought that relief. But what the Court said is you're in for a penny, you're in for a pound. You ask for a declaration of your fishing rights, and we're going to decide what your fishing rights mean. So, okay. But how do we use what happened there to determine what they were doing back in the original Washington? Well, I'm not sure you need to, because in 1990, first of all, they sought that ruling. I mean, Quilley and Quinault and Hoe asked the Court to make a ruling  They obtained that ruling, and nobody has challenged that in the 33 or however many years it's been since then. Secondly, in 1993, the District Court said there was a new judge assigned to the case, and she said, I think maybe we should end this case. And all the tribes submitted a response saying, don't do that, Your Honor. One of the reasons you shouldn't do that is because of the waivers of immunity that are in place. In the 83-9 proceeding, the in for a penny, in for a pound could only be relevant as to the Macaws, because they were the defendant. Well, the issue was, what's the scope of waivers? Everybody, you know, the Court said that It would only be the scope of the Macaws waiver, because they were the defendant. You're not going to measure the scope of the plaintiff's waiver. Well, we all did the same thing, Your Honor. We all intervened in the same case. We all sought the same relief in terms of an adjudication of our fishing rights. To suggest that They're a plaintiff. Right. I mean, if, you know, we're all actually plaintiff interveners. We're all in the exact same posture procedurally. All the tribes intervened. So, okay, let's go back to the 83-9 proceeding. So the QQH tribes then bring an action against the Macaw. The Court rules that the Macaw have waived their sovereign immunity. Had the Macaws brought a counterclaim against the QQH tribes, was that sustainable in the 83-9 proceeding? If it related to an adjudication of their fishing rights, absolutely. That's not what the Supreme Court told us in Pottawatomie. The Supreme Court said even a compulsory counterclaim cannot be maintained against a tribe that has not waived its sovereign immunity and consented to the settlement. Well, you know, that ruling was based on U.S. v. Oregon. And it's been the I'm sorry, which ruling was it? The 83-9 ruling. The 83-9, right. But Pottawatomie is since then. The Supreme Court has said a compulsory counterclaim A plaintiff has not waived its right to assert sovereign immunity against a compulsory counterclaim. So the Macaw could not have brought even a compulsory counterclaim against the QQH unless they've waived their sovereign immunity. My conversation with Ms. King, I suggested that that brings us all back to the same question, which has nothing to do with whether anybody's waived their sovereign immunity in 83-9. It's whether they waived their sovereign immunity in 1971 and 1974 when Judge Bull decided all of this. But, Your Honor, I guess my response would be the answer to that question, what was the effect in terms of waivers of immunity when the parties intervened in this case? There was a ruling in 83-9 that the effect was to consent to a full adjudication of the treaty right. We're not bound by that. There's no Ninth Circuit opinion. This is an unappealed ruling by a district court that may or may not be persuasive. I understand that, Your Honor. The Quileute and Quinault said that defines the waivers of immunity in their 1993 submission to the district court. Now you're talking about estoppel. What's that? You're talking, you're testing estoppel. Well, I'm talking about waiver. I'm talking about waiver. I mean, if they say to the district court, all of the tribes, including us, have waived our immunity for purposes of a full adjudication of our treaty right, if that's their representation to the district court, that's a waiver of immunity. You can't come to the district court and say, Your Honor, we have all waived our immunity for purposes of a full adjudication of our treaty right, as you said in 83-9, and then come back the next week and say, but not us. When we said all of us, we didn't mean us. They told the court what those waivers meant, and what they said is it's a full adjudication of the treaty fishing right. I think it would be more, how would you say it, it would be a bit clearer if you could just look at what they did when they initially intervened. Well, and as I said, if you look at what they did, it's pretty clear. So why do we have to go elsewhere? Because that's the way the district court analyzed it, Your Honor. This is de novo. Yeah. Is the subject matter of this litigation inextricably linked with the prior U.S. v. Washington litigation? Absolutely. The heart of U.S. v. Washington was a determination of tribal, usual, and custom fishing grounds. That's what, you know, 50% of the original decision was about. That's why you're still hearing appeals on usual and custom fishing grounds today. The treaty right is a treaty right to fish at usual and custom grounds. And so in order to adjudicate the treaty right, you have to know where usual and custom grounds are. And that's been true since the beginning of the case. That's why Judge Bolt talked about what that term meant. That's why Judge Bolt made findings about usual and custom grounds. And that's why we keep litigating usual and custom grounds. So we've got the original complaints and intervention. We have the district court's interpretation of the scope of the waivers in the 83-9 proceeding. We have the 1993 statements in which Quilley and Quinault embraced that interpretation of their waivers. And then we have a series of statements since then in which Quilley and Quinault have said that their usual and custom grounds in the ocean can be litigated in this case. They said that to the federal regulators when they didn't like the federal boundaries. They said, You can't do this. It hasn't been determined yet. You know, there can't be any prejudice to a determination in U.S. v. Washington. What they told the feds is a whole other issue. But I think it relates to whether they've waived immunity. I mean, if they say we've waived immunity and then they come here and say, Well, we haven't waived immunity. I mean, it's we're in. We need to look at what happened in the lawsuits here, this case. Well, we have. The underlying case. Is this case? Are you saying it's an inappropriate and untimely collateral attack on federal regulations defining the scope of the appellant tribe's oceanic treaty rights? I don't think this is an attack on the federal regulations at all. From the beginning, the federal regulations have said these are interim boundaries pending in adjudication in U.S. v. Washington. The United States has said explicitly that the place that these issues should be resolved is in U.S. v. Washington. And Quinlan et al. said that as well, that those are interim accommodations until there's a determination in U.S. v. Washington. Okay. Let me give my colleagues some time unless there's something else. Good morning. May it please the Court. My name is Joe Pinesco. I'm an Assistant Attorney General for the State of Washington, and I'm here representing my client. Washington State is an interested party, and the outcome of the issues below will directly impact the resource management for the State of Washington. The appellant's underlying premise of their immunity claim is that Washington State had no jurisdiction in offshore waters at the time they filed this case. That is patently false. The State's brief cites case law and regulations showing that the State asserts and exercises regulatory jurisdiction over its citizens out to the 200-mile line and had done so in the early 1970s. The Quileute expressly invoked the Court's jurisdiction over State citizens in an injunctive capacity in four different crab disputes, one of which became a subproceeding. And the specific citizen activity that the Quileute sought to stop was State citizens harvesting crab within and beyond the three-mile line. So it is disingenuous for them to now claim that they have never waived immunity for the waters that are at issue in this subproceeding. The Quileute and Quinault have stipulated below that their adjudicated, usual and accustomed areas, stop at the three-mile line. So while the State has historically tried to work cooperatively with the tribes in the management of resources, if they succeed in their invocation of sovereign immunity here, apparently the State would be cleared to start regulating all tribal harvest of crab and a few other resources that the State does manage beyond the three-mile line. The State could require regulatory permits, and not even for conservation purposes but for other management purposes. The State could start imposing excise taxes on the fish that those tribal members are landing that are brought in from beyond that three-mile line. Sorry, I'm missing the logic here. They're claiming they have a treaty right to fish out beyond the three-mile line, yet they admitted below that it has not been adjudicated and that the judge's rulings never addressed that. Well, then the State's not bound by the injunctive provisions of U.S. v. Washington and would be able to regulate its citizens, which includes the tribal members, because their catch would not be subject to the treaty rights that are subject to the injunctive. So, yes. Well, you're saying be careful what you ask for. Yes. So, the State asks the courts to dismiss this appeal and allow the district court matter to resolve the dispute over the scope of the judicial process. By the way, the district court suit is progressing on, correct? Yes. We're in discovery. Depositions start Friday. Okay. Thank you. May it please the Court. My name is Lauren Rasmussen for the Port Gamble-Skallam and Jamestown-Skallam Tribes. We're interested parties in this sub-proceeding. We were interested parties in the previous sub-proceeding, and we have an interest in all tribes being treated the same with respect to the adjudication of their treaty rights. The fact that this case creates two classes of treaty rights, one which is resolved in the federal arena and one that is resolved in the U.S. v. Washington, dilutes the treaty rights of the Skallam Tribes, who are the next in line to fish on those fish that are coming from the ocean. And you asked the question, Judge Callahan, is this UNA question inextricably linked to the original case? And I turn your attention to 384F sub 312 at 409 and 410. And these are the Q&As that Judge Bolt answered. Do the fish caught by a member of one of the plaintiff's tribes in the all-citizen fishery count toward the off-reservation 50% share of his tribe? Answer. Fish caught by a member of one of the treaty tribes while fishing in the all-citizen fishery at usual and accustomed places of the tribe will be included in the tribe's off-reservation share of the harvest. If a tribal member fishes in the all-citizen fishery at a location which is not a usual accustomed ground or station of the tribe, that individual's catch will not count towards the tribal off-reservation share. How can the court make that determination, the determination of whether it's in the usual and accustomed grounds or not in the usual and accustomed grounds, if the ocean tribes seek to be exempt and create a loophole from the requirements of establishing those historical locations that all the other tribes in USB Washington, including Macaw, have taken very seriously and have done? Thank you, Your Honors. Thank you, Counsel. Okay. Anna, I believe you had some time for rebuttal. May it please the Court, my name is Eric Nielsen and I represent the Quinaultinian Nation in this matter. I think based on the dialogue that has been occurring, I think the question or at least what I get, the question that's really troubling the Court is this whole idea of intervention  You can't divorce the idea that this case, the relief that was requested by this case by the United States when the complaint was filed was to enjoin the state of Washington from interfering with tribal treaty fishing rights in any waters under the state's jurisdiction in western Washington. I mean, that's what the complaint itself said. By intervening in that complaint, neither Quinault, nor Quileute, nor any other tribe had the right or the authority to expand the complaint beyond what the relief that was requested. That's not true. You came in as a plaintiff. We intervened in that case. Which side did you intervene on? On the side of the United States. You came in as a plaintiff. But we're just You were seeking your own, technically what you were doing was seeking your own determination of your treaty rights. Within the framework of the complaint filed by the United States. If I pull out the complaint, is that what it's going to say? The complaint will say that The intervention complaint. The intervention complaint will say what you've just been told that it says. How do you get around that? Well, because, Your Honor, all we were doing at the time that we intervened was we were joining the United States complaint. Those are your words. Your words in the intervention complaint don't sound like it's they don't sound like confining words. But we could not expand the nature of the relief requested in the United States complaint. By intervening, we could not do that as an intervening party. Did you file a separate complaint? We filed a complaint on intervention. That's what was filed by all the tribes. A complaint on intervention means what? It means that we're intervening and this is what our This is your party? This is what we're saying. Right. This is what we're saying. Were you seeking anything in addition to what the United States was seeking? No. There's nothing to indicate that we're seeking anything in addition. How long was your complaint? Oh, God. A page. Not even. And in addition, I think as Ms. King pointed out, which you've got to remember, at the time the complaint was filed, nobody asserted jurisdiction over fisheries in the ocean beyond three miles. That couldn't have even been a part of the decision. It couldn't have been decided. And then what Judge Bolt did in his pretrial orders and subsequent rulings. But under, you know, if you go to the treaty, the whole basis for the litigation, it all derives from treaty rights. Correct. Fishing rights under the treaty. Do they extend out into the ocean? Your Honor, not to be obstreperous, but all derive from the treaty fishing rights within the jurisdiction of the whether they extended out beyond that where nobody had jurisdiction at the time. So you don't contend that your rights under the treaty extend out beyond the borders of the ocean? I contend that our rights in the treaty have not been adjudicated in this case beyond that. What we had a self-executing treaty with the United States of America. We didn't have to seek Judge Bolt's determination of what our treaty rights were in the ocean. The whole concept of an adjudicated, usual and accustomed treaty heir is the child of this case. And it's the child of this case because this case was brought against the state of Washington. It was brought against the state of Washington to enjoin the state from interfering with that right. There was no allegations that the United States were interfering with anybody's treaty right. This case isn't about the United States suing itself saying, oh, your honor, please also decide what these treaty rights are with respect to the United States. Couldn't have. Didn't because there was no jurisdiction. So the case was just all about the state of Washington. How is it that it's evolved to where it is now? That's a good question. I wish I could answer it. It's gone way, way, way beyond that. Your honor, you're absolutely correct. It has gone. This case has probably morphed beyond what Judge Boldt or any of the original attorneys could have even imagined at the time where this case would go. And, in fact, this court has even commented on that on a couple of occasions, that this case is so beyond what it was ever intended when it was originally decided and when it was originally filed that it's hard to even grasp what this case is about anymore. You know, and recently, as the court's well aware, recently the district court has basically decided, you know, I know I've been dealing with all these allocation issues, with all these issues, disputes between the tribes, but I'm not going to do that anymore. And in the Skokomis case in 2009, this court even questioned whether the district court had the authority or the jurisdiction to do it in the first place. So perhaps the case is starting to become a little more manageable. Perhaps in the future it will become more manageable. But, your honor, that's a long way of answering your question. I don't know how it morphed into what it morphed into. But what we're talking about here, I think, is a very discreet issue. It's whether the Kwinauts or the Kuius or the Ho waived their sovereign immunity with respect to this case, this proceeding to determine their fishing areas in the ocean, fishing areas that have already been determined by their treaty partner, the United States. And, in fact, Judge Rothstein, in the Medwater Trowlers decision, she found that that determination was rational, was reasonable. McCaw itself was a party to that case. They didn't raise any objections. Kwinaut and Kwiliut have been fishing out in that area for nigh on 25, 30 years. Nobody said anything. Nobody has raised the question, why should we be fishing out there? And there's been not one case, not one proceeding in this case, where a determination of Kwinaut and Kwiliut's fishing rights in the ocean was ever necessary to decide the issue in that case. And that is the standard under McClendon. McClendon tells us that in order to find an express waiver of immunity, because we cannot find implied waivers of immunity, the Supreme Court has said there is no such thing as an implied waiver of immunity. And in order to find an express waiver of immunity, the issue in dispute, when a tribe participates in litigation, has to be necessarily decided. You have to necessarily decide that issue to find that you've waived your immunity with respect to that issue. In none of these cases, not one of these cases, has that ever been. So Appellee's counsel said that in subsequent proceedings that you represented to the court that you had waived your sovereign immunity. What's your response to that? My response is I would like to know what those proceedings are. I mean, you have the briefing, and we've explained, they've pulled that out, and they've said, yeah, well, in this proceeding, in this proceeding, they, you know, cite 3, 4, 5, 6, whatever it is. And we've responded in the briefing. I don't know what proceeding where we have expressly waived our immunity to any adjudication. Let's suppose that we thought that you had, I'm just going to give it to you as a given, that you have in fact represented, I don't know if this is true, it's a hypothetical, that you have represented to someone that you have waived your sovereign immunity in a previous case, or that you waived your sovereign immunity in 1974. Would you be bound by that representation as a matter of sovereign immunity, or would it fall more under towards the judicial estoppel point that Judge Pai has referred to? Well, I don't think that it would, it's an express waiver of immunity for this action in this case. No. I think that the whole standard of waivers of immunity, as this court has found in the McClendon case, and in subsequent cases after that, is that the waiver of immunity has to be expressed. I mean, just because, you know, you may say, make a statement that suggests, oh, well, you know, we might be willing to adjudicate this in this case, or, you know, the court might have jurisdiction in this case, does not a waiver of immunity. I mean, there's just no law that anybody can cite that says that's a waiver of immunity, because it isn't a waiver of immunity. And I'll bet you if there was authority for that proposition, then McCall would cite it. They're very, very good attorneys, and they would have cited it. So one of the other arguments they raised was that your appeal is that the appeal is untimely. Yeah. What's your response to that? Well, I think if you look at page 24 of our brief, we set out the different various orders that we're talking about here. This was – You know, when I read Judge Martinez's orders, the first one when he deals with sovereign immunity seemed pretty clear. He just said, you waive your sovereign immunity. But if you look at that order, Your Honor, and this is I think why it got all confusing is because when you look at that order, he also says, and hey, all I'm going to do is consider the evidence in front of Judge Bolt. That's all this case is about. If that's all this case is about, that's an A1 case. It's not an A6 case. Even if there was some ambiguity in that, when the other tribes moved for reconsideration or clarification of the order, he then specifically said in his order on clarification that, look, all I'm going to consider, once again, is what was before Judge Bolt, and this is an A6 – I mean an A1 proceeding. It wasn't until we get to this motion for summary judgment and your issues are already – well, the tribe should have read this as I'm going to do an A1 and then depending on how that goes, we'll do an A6. Well, that's really not what the language of the order says. And if because we or because – How does that all relate to what they were seeking to do? I mean they were seeking at the very beginning to determine the usual and accustomed UNAs outside the boundaries of the state of Washington from the get-go. Right. So why does this later order sort of impact that? Well, because – When I read it, it seemed like all he was doing was saying – clarifying which provisions under Paragraph 25 that he was going to follow in resolving the request for determination. Well, and apparently that's how he thought we should have read it as well, based on his subsequent orders. But I think – I just read it. That's what it struck me. Well, you know, all I can say is that, you know, when you read the order and it says, look, all I'm going to do is – and we've got to go back in a little bit of history here and we talked about it or the Court talked about it in the last case you just heard. But in the Muckleshoot case, you have this A1 and A6. A1, you don't get to present new evidence. A6, you know, you can present new evidence. So the whole – when you're reading that, at least from our point of view, and you're reading that order, you're going, okay, all he is going to adjudicate is an A1 proceeding. He's just going to decide, based on the evidence already in the record, what did Judge Bolt mean by adjacent. And that – okay, so Judge Bolt may have meant by adjacent three miles. He may have meant two miles. That was going to be the issue in the case. It wasn't going to say, oh, well, Judge Bolt only meant two miles, therefore you don't have any treaty rights beyond two miles or one mile or whatever. It's not very clear to me that he's even going to go to an A6-type proceeding when you read his order. Well, it wasn't clear – well, okay. But, I mean, I don't think it's that clear at all. And that's probably why – and I'm just assuming. I don't know. I don't know what their intent was. But I would suspect that that's why the other tribes filed a motion for clarification and reconsideration. I don't suspect they read it that way either, or they wouldn't have filed the motion that they filed. All right. Okay. We are over your time. Thank you very much. Thank you. Thank you, Counselor. Interesting case. The matter is submitted, and we appreciate all your arguments. It's very helpful.
judges: Paez, Bybee, Callahan